PRINTERS II, INC., Plaintiff-Appellee,

v.

PROFESSIONALS PUBLISHING, INC.,
Defendant-Appellant.

No. 480, Docket 85–7661.

United States Court of Appeals,
Second Circuit.

Argued Nov. 20, 1985.

Decided Feb. 20, 1986.

Patrick H. Barth, New York City (Eric M. Cahalan, Alan Winkler, Sudler & Barth, New York City on brief), for defendant-appellant.

Gerald G. Paul, New York City (Flemming, Zulack & Williamson, New York City on brief), for plaintiff-appellee.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and WYATT, District Judge.*

JON O. NEWMAN, Circuit Judge:

Professionals Publishing, Inc. ("Professionals") appeals from a judgment of the District Court, 615 F.Supp. 767, for the Southern District of New York (Robert W. Sweet, Judge), awarding Printers II, Inc. ("Printers") $373,470.43 on a breach of contract claim following a bench trial. On appeal, Professionals contends that the District Court's factual findings were clearly erroneous and that it was entitled to a jury trial on two of its defenses and one of its counterclaims. For reasons that follow, we affirm.

## I. Background

Printers is a District of Columbia corporation that operates a commercial printing press in Tuxedo, Maryland. Professionals is a Nevada publishing corporation with offices in New York and Pennsylvania. In 1982, Professionals hired Printers to print and circulate the first issue of the "Physicians' Travel and Meeting Guide" ("the Guide"). The Guide is a glossy publication that contains listings of meetings, symposia, and seminars for doctors, as well as editorial matter, articles, and advertisements. The Guide's subscription price is $20. In January 1983, Printers circulated 175,000 copies of the first issue, which consisted of 136 pages. Pursuant to contract, Printers was paid a previously agreed upon price after completing its services.

In June and July of 1983, the second issue of the Guide, the "Summer/Fall 1983" issue, was printed and mailed by Printers. The second issue appeared in both a pharmaceutical version, aimed at prescription-writing doctors, and a consumer version. Printers mailed 155,000 copies of the 120-page consumer version and 135,000 copies of the 168-page pharmaceutical version. Payment for the second issue was the result of an informal arrangement between the parties. No specific price had been set for Printers' services. Printers simply sent invoices to Professionals after completion of the entire job, which Professionals paid without complaint. Indeed, the parties were extremely solicitous of each other's needs. Although the terms of Printers' invoices required payment within thirty days of issue, the parties seem to have established ninety days as the appropriate payment period. To aid Printers in obtaining financing based on its invoices, Professionals executed two promissory notes to cover payment for the second issue.

These informal payment procedures, however, ultimately caused the relationship of the parties to deteriorate and led to the instant controversy. While the Guide's third issue, the "Winter/Spring 1984" issue, was in process, Printers invoiced Professionals for paper costs of $97,435.00 on October 20, 1983. Printers contends that the parties agreed to alter their previous course of dealing and that Printers was entitled to invoice Professionals for the paper to be used for the third issue upon receipt of the paper. Professionals contends that no invoices were to be sent prior to completion of Printers' work on the issue. After passage of ninety days, Printers demanded payment of the October 20 invoice. Robert Saum, the President of Printers, told Walter Doerk, the Printers' employee in charge of dealing with Professionals, that distribution of the third issue, which had begun in December 1983, would cease unless Professionals satisfied the paper invoice. Whether this communication

* The Honorable Inzer B. Wyatt of the United States District Court for the Southern District of New York, sitting by designation.

was a threat or a plea for operating funds is a contention between the parties. The District Court found that Doerk communicated Saum's position to Professionals' President, Stephen Salinger. As a result, Professionals promptly paid the paper invoice.

The parties' difficulties were exacerbated by delays in the printing of the third issue. The chief problem was the inclusion of certain materials that had to be affixed to each copy by hand. In addition, Printers was required to prepare eight variations of the third issue to satisfy Professionals' needs. In December 1983 and January 1984, Printers distributed 185,000 copies of the 168-page consumer version and 135,080 of the 240-page pharmaceutical version. Printers issued a final invoice, dated January 17, 1984, for its services in the amount of $490,176.99. When Professionals objected to the charge for printing and binding, Printers negotiated a reduction with the outside binder and issued a second "January 17, 1984" invoice in the amount of $436,371.99.

Professionals continued to object to the charge for printing and binding and also objected to the charge for paper. Although the parties were once within $5,000 of agreeing on Printers' compensation, negotiations broke down. Printers submitted its third "final" invoice, dated April 3, 1984, for $373,470.43. This invoice reflected a credit for the $97,435.00 paper payment and $34,533.44 in new charges. However, except for these new developments, the total charge on the April 3 invoice was identical to that on the second January 17 invoice. To induce Professionals to tender payment, Printers wrote to the Guide's advertisers and informed them that Professionals had not paid its printing bill. This tactic did not induce payment.

Printers commenced this diversity action to obtain compensation for printing and mailing the third issue of the Guide. Printers alleged breach of contract and the right to a *quantum meruit* recovery. Professionals counterclaimed for libel, tortious interference with contractual relations, and *prima facie* tort.[1] Professionals demanded a jury. However, since the jury demand was untimely under Fed.R.Civ.P. 38(b), the District Court, 596 F.Supp. 1051, exercised its discretion under *Noonan v. Cunard Steamship Co.*, 375 F.2d 69 (2d Cir.1967), and *Higgins v. Boeing Co.*, 526 F.2d 1004 (2d Cir.1975), and refused to grant a jury trial. Professionals was subsequently allowed to amend its answer to allege duress and extortion as affirmative defenses and extortion as a counterclaim. Professionals then made a timely jury demand with respect to the new issues. The District Court bifurcated the trial and tried the non-jury issues first.

Following the bench trial, the District Court held that Printers' action was on the contract rather than in *quantum meruit*.[2] By analogy to UCC § 2–305, the District Court reasoned that Printers and Professionals had agreed upon a contract with an open price term. The central factual problem, therefore, was to ascertain the fair value of Printers' services. Although Professionals objected to the amount of the charges for paper and binding, the District Court held that the charges contained in the April 3, 1984, invoice were reasonable and entered judgment for Printers in the amount of that invoice.

The District Court rejected the libel counterclaim because it viewed the contents of Printers' letters to Professionals' advertisers as true. The letters stated that Professionals had not paid its printing bill, and such payment had not been made as of the dates of the letters. The District Court

---

1. Professionals also alleged affirmative defenses of lack of jurisdiction over the defendant, accord and satisfaction, payment, and the statute of frauds, and counterclaims for breach of contract and lost subscriptions. However, Professionals abandoned these contentions in the pretrial order.

2. Under Maryland law, which the parties agree governs Printers' claims, a profit may be recovered on the contract but not in *quantum meruit*. See *Petropoulos v. Lubienski,* 220 Md. 293, 152 A.2d 801 (1959).

rejected the tortious interference counterclaim on the ground that Printers' letters had not caused Professionals any harm. Those advertisers who withdrew orders for ads in the fourth issue of the Guide did so, in the District Court's view, for reasons unrelated to Printers' writing campaign.[3] The District Court dismissed the counterclaim for *prima facie* tort as legally insufficient.[4]

The District Court then turned to the duress and extortion issues, on which Professionals had timely demanded a jury. Without deciding whether New York would recognize an implied cause of action for extortion in violation of N.Y. Penal Law § 155.052(e) (McKinney 1975), the District Court held that Professionals could not successfully advance an extortion claim because any sums Professionals had been pressured into paying were rightfully due Printers. The Court rejected the duress and extortion affirmative defenses for the same reason. Therefore, the District Court believed it was unnecessary to hold a jury trial and entered final judgment for Printers on all issues.

## II. Findings of Fact

Professionals challenges the following findings of the District Court on the non-jury issues: (1) The charge for paper was reasonable, (2) the charge for binding was reasonable, (3) the letters to Professionals' advertisers were true, and (4) Professionals was not harmed by the letters to its advertisers. Mindful that we must affirm the District Court unless its findings are clearly erroneous, Fed.R.Civ.P. 52(a), we consider each contention in turn.

## A. The Charge for Paper

The District Court found that it was customary in the printing industry for the printer to make a profit on paper purchased from outside sources. It also found that a reasonable markup on outside services was 5–10%. There was ample evidence to support both findings. The cost of paper to Printers was undisputed: $167,152.96. The controversy involves identifying the amount of Printers' charge to Professionals for paper so that the propriety of the markup component may be assessed.

On both January 17, 1984, invoices, the paper charge is reflected as $212,551.99, which includes an apparent markup of 27.2%. On the April 3, 1984, invoice, the paper charge appears as $197,924.37, or 18.4% above Printers' cost. Professionals argues that both of these markups are substantially in excess of the upper limit of the range that the District Court found was reasonable. Printers responds that the April 3 invoice reflects the correct paper charge and that this invoice includes a handling charge of $12,955.83. Using the April 3 invoice and separating the handling charge from the paper charge leaves a markup of only 10.7% on the paper.

Thus, the issues are whether the District Court's choice of the April 3 invoice was justified and whether the District Court properly believed that the handling charge had been included in the charge for paper. As noted, once adjustments are made for new developments, the second January 17 invoice and the April 3 invoice contain the same total charge to Professionals. Some individual items are increased on the April

**3.** Since Professionals' claim of damage related only to orders for a future issue of the Guide, the fourth issue, its counterclaim might appear improperly pleaded. Absent an existing contract, the relevant business tort is intentional interference with prospective business relations. However, the District Court found that, although orders for the fourth issue could be canceled by the advertisers without penalty in accordance with industry custom, the orders were technically contracts and the relevant tort was interference with contractual relations.

**4.** Relying on *Natural Nutritional Foods Association v. Whelan,* 492 F.Supp. 374 (S.D.N.Y.1980), and *Rodgers v. Grow-Kiewit Corp.,* 535 F.Supp. 814 (S.D.N.Y.), *aff'd without opinion,* 714 F.2d 116 (2d Cir.1982), the District Court reasoned that a claim for *prima facie* tort will not lie where it rests on the same allegations that are insufficient to sustain traditional tort causes of action, such as libel or tortious interference with contractual relations, and the alleged tortfeasor is motivated, at least in part, by business concerns. Professionals does not challenge this ruling on appeal.

3 invoice, while others are decreased. Given the informal nature of Printers' arrangement with Professionals, it may be that Printers first calculated the total bill and later refined the breakdown among individual cost categories. Therefore, although the record presents no explanation for the reduced paper charge on the April 3 invoice, the District Court was justified in using this invoice to determine the cost of individual items. Moreover, there was evidence, which the District Court was entitled to credit, that it was customary in the trade for a printer to include a handling charge with respect to paper purchased from outside sources. Since the April 3 invoice does not include any item labeled "handling charge," it was reasonable for the District Court to believe that the handling charge was included in the paper charge. Therefore, there was support in the record for a finding that the real markup on the paper was only 10.7%. Since this percentage barely exceeded the 5–10% range properly found reasonable by the District Court, we cannot say that the District Court's finding on the reasonableness of the markup on the paper was clearly erroneous.[5]

Moreover, there is no reason to believe that individual cost items on the April 3 invoice were juggled to disguise an excessive charge for paper. If that were so, Professionals should be able to identify some increased item as an excessive charge. Yet it has not done so. Nor can Professionals claim that the total charge was unreasonable. The total charge of $436,371.99 was 14.7% above Printers' total cost of $380,320.68. There was evidence from which the District Court could have concluded that a 10–15% markup was reasonable on services performed by the printer itself. Taking this in conjunction with the 5–10% markup found as reasonable on services performed by the printer itself, we cannot say that 14.7% is unreasonable as a total markup. Moreover, the total markup on the first and second issues of the Guide,

to which Professionals did not object, was 22% and 25%, respectively.

B.  The Charge for Binding

■  Printers also employed an outside concern to do its binding, and Professionals challenges the binding markup as unreasonable. The parties disputed both the cost of binding to Printers and the charge for binding to Professionals. With regard to cost, a consultant to Printers identified the cost of binding as $51,992.50. Printers own computer printout states the cost of binding as $66,869.10. However, the invoices presented by the binder to Printers total $71,180.55. The District Court was entitled to find that the invoices were paid in full and that the other figures represent merely internal estimates by Printers.

Professionals argues that a cost of $71,-180.55 is excessive. It cites estimates from other specialists ranging from $14,292.50 to $30,000.00 for a job of the general type required by Professionals. However, as noted, the binding job was complicated by the need to prepare eight variations of two versions of the Guide and by the need to affix certain materials to the Guide by hand. In view of the complicated nature of the job, the District Court was justified in finding that the fair cost of binding was the cost negotiated by Printers and its binder in an arms-length deal.

The charge for binding is difficult to discern from the invoices issued to Professionals. A December 15, 1983, invoice lists the binding charge as $105,797.50. This invoice lists the charge for printing as $135,872.50. The binding and printing charges are combined on the first January 17 invoice as $241,670.00. Subsequently, Printers obtained a reduction in binding cost from the outside binder in the amount of $17,991.25. However, the second January 17 invoice reflects a printing/binding

---

5.  Although Professionals argues that a markup of 25–30% occurred on the paper that was the subject of the October 20, 1983, invoice, it is the total charge for paper, rather than component charges, with which we are concerned.

reduction of $62,685.00 and a total combined charge of $178,985.00. It is unclear how much, if any, of the reduction in excess of $17,991.25 is attributable to binding. The April 3 invoice reflects a further combined reduction and a combined printing/binding charge of $160,885.63.

Since it is impossible to separate the printing and binding charges after the December 15 invoice, estimates must be made. If we assume, favorably to Professionals, that there was no reduction in binding on the second January 17 invoice except that attributable to the reduction obtained from the outside binder, the printing/binding breakdown would be as follows: $91,178.75 (printing) + $87,806.25 (binding) = $178,-985.00. This would make binding 49.1% of the combined printing/binding charge. Multiplying this percentage by the combined April 3 charge of $160,885.63 gives $78,994.84 as the final separate charge for binding. This figure is 11.0% above Printers' cost of $71,180.55. Since 11.0% is very close to the 5–10% range the District Court found as reasonable with regard to markups on outside services, the finding of the District Court on binding charges is not clearly erroneous.

Moreover, the same result is reached if we consider the impressionistic evidence before the District Court. Printers' President, Robert Saum, testified that it was his policy to mark up the binding cost about 15%. In the absence of specific binding figures, the District Court was entitled to credit this testimony. It was also entitled to view 15% as sufficiently close to the 5–10% range to be a reasonable markup on binding. This is especially the case where, as noted, the total markup on all services was reasonable and below the total markups on the first two issues of the Guide.

C. Libel

█ Between March 30, 1984, and April 17, 1984, Printers sent 29 letters to Professionals' clients, the Guide's advertisers, informing them that Professionals had not paid its printing bill for the Guide. Seven of these letters specifically referred to "monies due" Printers, which the letters stated Printers believed to be in excess of $300,000. The object of the letters is clear. Printers hoped to coerce Professionals into paying the final printing bill by suggesting to Professionals' clients that Professionals was an undependable publisher. The District Court found that Printers' letters were true, since Professionals in fact had not paid the printing bill. Because truth is a complete defense to libel in New York,[6] see Commonwealth Motor Parts, Ltd. v. Bank of Nova Scotia, 44 A.D.2d 375, 355 N.Y.S.2d 138 (1st Dep't 1974), aff'd mem., 37 N.Y.2d 824, 339 N.E.2d 888, 377 N.Y.S.2d 482 (1975); Droner v. Schapp, 34 A.D.2d 823, 311 N.Y.S.2d 934 (2d Dep't 1970), the District Court ruled in favor of Printers on Professionals' libel counterclaim.

Professionals argues that Printers' letters, even if literally true, are misleading in substance because they impliedly represent that Professionals was neglecting to pay a debt after it had matured. In fact, the seven letters that alleged Professionals' failure to pay "monies due" were literally false. As Professionals notes, the April 3, 1984, invoice was not yet due on April 17, 1984, the date of the last group of Printers' letters. Printers argues that it was in reality trying to collect the second January 17, 1984, invoice, which was due by its terms thirty days from the date of issue. However, the parties had clearly established a course of dealing whereby the invoices, despite their terms, were deemed payable within ninety days from the date of issue. Under these circumstances, the second January 17 invoice did not become due until April 16, 1984, after the dates of 21 of Printers' letters.

Under New York law, it is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the gist or substance of the challenged statements be true. See Rinaldi v. Holt,

6. The parties agreed, and we assume, that although Maryland law governed Printers' contract claims, see note 2, supra, New York law governed Professionals' tort counterclaims.

*Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y.S.2d 943 (1977); *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 445 N.Y.S.2d 156 (2d Dep't 1981). Although Printers' letters may have impliedly misrepresented that Professionals was overdue in paying its printing bill, Printers could accurately have informed Professionals' clients that Professionals was disputing the printing bill with such vigor that it was apparent that Professionals would not pay the bill when due. Since the import of this statement is very close to that of the statements actually made by Printers, we cannot say that the District Court's finding as to the truth of Printers' statements was clearly erroneous.

### D. Tortious Interference with Contractual Relations

■ The District Court found that Printers' letters intentionally interfered with Professionals' contracts with its advertisers. Certain of these advertisers withdrew their orders for ads in the fourth issue of the Guide. However, because the District Court found that these advertisers withdrew their business for reasons independent of Printers' writing campaign, it held that Printers' letters had not caused Professionals any harm and ruled in favor of Printers on Professionals' tortious interference counterclaim.

Of the clients that paid for advertisements in the third issue of the Guide, four withdrew their orders for ads in the fourth issue. Professionals offered proof only as to one of these companies, Mead Johnson. Stanton Scherer, the president of Pharmaceutical Media, Inc., an advertising agency used by Professionals, testified that the loss of Mead Johnson's business was attributable to Printers' letters. Alison Gale, a Mead Johnson employee, testified that

Mead Johnson withdrew its order as a result of dissatisfaction with Professionals' services. Because the District Court was entitled to credit Gale's testimony instead of Scherer's, its holding on the lack of harm arising from Printers' interference with Professionals' contractual relations is not clearly erroneous.[7]

### III. Jury Trial

■ In addition to the non-jury claims, Professionals asserted duress and extortion as affirmative defenses and extortion as a counterclaim. Professionals alleged that Printers' threat to cease circulating the third issue of the Guide unless the October 20 invoice for paper was paid and Printers' letter-writing campaign to induce payment of the final bill constituted duress and extortion. The District Court reasoned that Printers had only coerced Professionals into paying amounts it was rightfully due and that such conduct did not constitute duress or extortion. Professionals argues that it was improper for the District Court's factual findings on the reasonableness of Printers' bill in connection with the non-jury issues to preempt its right to a jury trial. We agree with Professionals that the trial of the non-jury issues may not be used to collaterally estop Professionals on fact issues to which it was entitled to a jury. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Goldman, Sachs & Co. v. Edelstein*, 494 F.2d 76 (2d Cir.1974). But Printers seeks to uphold the judgment on the ground that Professionals' jury issues are deficient as a matter of law. This contention initially requires some analysis of Professionals' pleadings.

Professionals' extortion counterclaim is really two claims—one for extortion with respect to any portion of the October 20 invoice payment in excess of what was

---

**7.** Professionals also asserts that Printers' writing campaign breached its duty to perform its contract with Professionals in good faith. As a result, Professionals argues, Professionals was relieved of its duty to perform on the contract, and Printers was relegated to a *quantum meruit* recovery. Were this the case, Printers would not be entitled to recover a profit. *See* note 2,

*supra.* However, Professionals has never asserted Printers' breach of contract as an affirmative defense. Professionals did assert a counterclaim for breach of contract but withdrew that counterclaim in the pretrial order. Therefore, Professionals may not rely on an alleged breach of contract by Printers on appeal.

rightfully due Printers and another for attempted extortion with respect to the final printing bill. Because Professionals did not pay the final printing bill despite Printers' writing campaign, no property changed hands as a result of Printers' coercion; any improper activity would at most be an *attempt* to secure payment. Moreover, Professionals is in reality asserting only counterclaims and not affirmative defenses. With respect to the October 20 invoice, Professionals does not seek to "defend" against payment of a reasonable price; it seeks to recoup that portion of the fee that was in excess of a reasonable price. Such recoupment is the subject of the counterclaim. With regard to the final printing bill, Professionals similarly does not seek to avoid payment of a reasonable price; it seeks damages in its counterclaim. With the jury demand thus limited to Professionals' counterclaim for extortion and attempted extortion, we now consider whether Professionals stated valid claims under New York law.

New York defines larceny by extortion as wrongfully depriving another of his property through fear of injury to himself or his property. N.Y. Penal Law § 155.-052(e) (McKinney 1975). Although we have held that New York would recognize an implied cause of action for violation of its criminal harassment statute, *see Galella v. Onassis,* 487 F.2d 986, 994 n. 11 (2d Cir. 1973), no court has had occasion to decide whether there is an implied cause of action for extortion.

■ However, even if we assume that New York would recognize such an implied cause of action, we do not believe that New York would extend it to cover what are at worst sharp business practices in connection with contract disputes—at least where, as in the instant case, the coercing party has a colorable right to payment and the only "threat" is refusal to continue performing the contract. *See DiRose v. PK*

*Management Corp.,* 691 F.2d 628, 633 (2d Cir.1982) ("under New York law, threats to enforce a party's legal rights do not constitute duress"). Since performance of a contract is usually a constructive condition of each obligor's promise, lack of performance will relieve an obligor of his duty to honor the contract. If either party believes there has been a failure of the constructive condition of performance, he is entitled to cease performing, subject only to the duty to pay contractual damages if his belief is later adjudicated to be erroneous. Therefore, we believe that Professionals has no valid counterclaim for extortion based on Printers' threat to cease circulating the Guide unless Professionals paid the October 20 invoice for paper.

■ Finally, we do not believe New York would extend any civil cause of action it might recognize for extortion to cover attempted extortion of the amount of the final printing bill. Where no property is transferred as a result of the coercion, the only possible harm to the victim from attempted extortion lies in that resulting from the coercing process. In this case, Professionals' coercing method, the writing of letters to Professionals' clients, is independently actionable in tort under the head of intentional interference with contractual relations. Had Printers' letters caused harm to Professionals, this traditional tort action would have afforded Professionals compensation for being the object of coercion. Since Professionals cannot have suffered any further harm resulting from Printers' extortionate activity, Professionals has not stated a claim with respect to attempted extortion of the amount of the final printing bill.

The claims triable to a jury were therefore properly rejected because each of them was deficient as a matter of law.

## IV. Conclusion

The judgment of the District Court is affirmed.[8]

---

**8.** In submissions to this Court, Professionals asserts that it has remaining claims against Printers for conversion and racketeering. Professionals has never alleged a conversion or

RICO claim in the District Court and may not do so for the first time on appeal. The pretrial order contains language that Professionals asserts preserves it right to make a RICO claim in

the event *Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482 (2d Cir.1984), is overruled, which has now occurred. —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346. Whatever rights Professionals

may have reserved in the pretrial order cannot entitle it to upset a final judgment entered before any RICO claim was in fact asserted.