**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Guardian Bank, N.A., Plaintiff,**

v.

**Louis B. BERNSTEIN, et al., Defendants.**

**In the Matter of the Application of Michael H. SOROKA, as Independent Receiver of the New York Guardian Mortgagee Corporation, Enforcing the Agreement with Federal National Mortgage Association.**

**FEDERAL NATIONAL MORTGAGE ASSOCIATION, Plaintiff,**

v.

**Michael H. SOROKA, individually and in his capacity as the Independent Receiver for The New York Guardian Mortgagee Corporation, and the New York Guardian Mortgagee Corporation, Defendants.**

**Nos. CV 89–2080, CV 91–1441.**

United States District Court, E.D. New York.

Jan. 10, 1992.

**172**

Reid & Priest, New York City, for plaintiff; Evan Widlitz, Linda Terner, of counsel.

Marc Wieman, New York City, for the F.D.I.C. (Corporate).

Louis B. Bernstein, pro se.

Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, for Michael H. Soroka, Independent Receiver of The New York Guardian Mortg. Corp.; Victor J. Rocco, Richard A. Roth, of counsel.

Cadwalader, Wickersham & Taft, New York City, for Federal Nat. Mortg. Ass'n; John J. Walsh, Kathryn L. Hoenig, of counsel.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

Michael H. Soroka ("Soroka"), both individually and in his capacity as the Independent Receiver for the New York Guardian Mortgagee Corporation ("NYGMC"), moves this court for an order dismissing the complaint of the Federal National Mortgage Association ("FNMA") or, in the alternative, staying the FNMA action pending determination of the *Application of Michael H. Soroka, as Independent Receiver of The New York Guardian Mortgagee Corporation, Enforcing the Agreement with FNMA* (the "Receiver's Application"), filed with the court on February 13, 1991.

The dual proceedings before this court involve, essentially, the interpretation of a portfolio servicing contract entered into between the Independent Receiver and FNMA on August 13, 1990. The operative facts relating to this issue are fully set forth in both FNMA's complaint and in the various affidavits filed in connection with the Receiver's Application and FNMA's Cross–Application.

## BACKGROUND

NYGMC and FNMA were parties to a Mortgage Selling and Servicing Agreement dated December 29, 1982 (the "1982 Servicing Agreement") pursuant to which NYGMC agreed to service approximately $1 billion in mortgages owned or held by FNMA. As a servicer for the FNMA mortgage portfolio, NYGMC was responsible for collecting and remitting required payments from the borrowers, including taxes, insurance, interest and principal; maintaining records with respect to each mortgage; and otherwise assuring that the mortgages were being performed in accordance with their terms. (Carpenter Aff. ¶ 3).

On June 21, 1989, the Office of the Comptroller of the Currency ("OCC") determined that Guardian Bank, N.A., an affiliate of NYGMC, was insolvent. The OCC immediately ordered Guardian Bank closed, took possession of its assets and appointed the Federal Deposit Insurance Corporation (the "FDIC") as the Receiver of Guardian Bank's assets. The next day, the FDIC commenced an action in this court against the Bank's officers and directors, alleging, *inter alia,* breaches of fiduciary duty, negligence, waste and violations of various state and federal statutes and regulations. The FDIC, through its agents, immediately took control of Guardian Bank's and NYGMC's files, including all the files relating to the portfolio of mortgages owned or held by FNMA and serviced by NYGMC pursuant to the Servicing Agreement.

The appointment of the FDIC and commencement of the FDIC action raised grave concerns regarding NYGMC's ability to continue servicing the FNMA mortgage portfolio. (Carpenter Aff. ¶ 6). To protect itself and its customers, FNMA immediately took steps to transfer servicing responsi-

bilities to a more stable servicing agent and to terminate the existing Servicing Agreement with NYGMC. Accordingly, on June 26, 1989, FNMA terminated the Servicing Agreement and NYGMC's right to service FNMA mortgages and participation interests. (Nichols Aff. Ex. A).

FNMA and NYGMC immediately began negotiations to arrange for the orderly transfer of portfolio documents from NYGMC to FNMA. These discussions culminated in a verbal agreement, pursuant to which NYGMC agreed to transfer the servicing rights back to FNMA or its designee, in exchange for $8,799,187.[1] FNMA and NYGMC also agreed that any liabilities FNMA incurred due to NYGMC's servicing errors or deficiencies and any extraordinary charges and expenses FNMA incurred due to the transfer would be offset against the $8,799,187 payment and that offsets in excess of $8,799,187 would be owed to FNMA. The specific categories of offsets were to be memorialized later in a written agreement.

### The Midlantic Agreement

FNMA soon approached Midlantic Home Mortgage Corporation ("Midlantic") about the possibility of Midlantic's taking over the mortgage servicing responsibilities of the FNMA portfolio. In October 1989, following four months of discussions, FNMA and Midlantic entered into an interim servicing agreement pursuant to which Midlantic agreed to take over servicing responsibilities from the period June 30, 1989 through December 1990 (the "Midlantic Agreement"). Midlantic demanded and the Midlantic Agreement provided for the payment of a one-time servicing fee of 50 basis points, over and above the normal servicing fee, to compensate Midlantic for taking over the management of the troubled FNMA portfolio. (Carpenter Aff. Ex. A, at 4). This fee, which amounted to approximately $4.5 million, was calculated based on the average principal balance outstanding at the end of each month of the Midlantic Agreement. *Id.*

### The Appointment of an Independent Receiver

On July 11, 1989, defendant Michael H. Soroka was appointed by this court to serve as the Independent Receiver for NYGMC. Shortly after his appointment and as part of his responsibilities, Soroka began to negotiate a formal written agreement memorializing the terms of the June 1989 portfolio transfer between NYGMC and FNMA and settling all claims and obligations between the parties. A primary purpose of these negotiations was to limit NYGMC's potential exposure to liabilities. Towards that end, the parties engaged in regular discussions concerning the nature and identity of the offsets that were to be deducted from the $8,799,187 purchase price.

Between August 1989 and August 1990, FNMA forwarded to Soroka a series of schedules which provided estimates for each "offset" category on an Account-by-Account basis. (Pearce Reply Aff. Ex. C). With respect to the offset entitled "Out-of-Pocket Transfer Expenses," FNMA's schedules consistently projected these expenses to be only $100,000. Although the negotiations endured for one full year, the estimated figures supplied by FNMA did not change.

| Date of FNMA Schedule | Estimated Expenses |
| --- | --- |
| August 31, 1989 | $100,000 |
| October 17, 1989 | 100,000 |
| October 26, 1989 | 100,000 |
| November 22, 1989 | 100,000 |
| February 26, 1990 | 100,000 |
| April 3, 1990 | 100,000 |
| April 20, 1990 | 100,000 |
| August 14, 1990 | 100,000 |
| August 27, 1990 | 100,000 |

(Pearce Reply Aff. Exs. B–E).

### The Agreement as Approved by this Court

On or about August 13, 1990, after a year of negotiations, the parties executed a written agreement (the "Agreement")

---

**1.** This amount represented two times the annual servicing fee that FNMA paid to NYGMC under the 1982 Servicing Agreement. (Carpenter Aff. at ¶ 7).

which memorialized the prior verbal agreement between FNMA and NYGMC. Under the terms of the Agreement: (1) FNMA and NYGMC settled all outstanding claims against each other; and (2) FNMA agreed to pay NYGMC $8,799,187 for the transfer of NYGMC's right to service FNMA loans and mortgages; and (3) the $8,799,187 termination fee is to be offset by the balances in 14 different categories enumerated in the Agreement (the "Accounts"). This court approved the Agreement, as executed by the parties, by order dated September 11, 1990.

Section 2.2 of the Agreement identifies and describes each of the 14 categories of Accounts, the balances of which were to be held back by FNMA and offset against the $8,799,187 purchase price. Account 8 provides for the holdback of "Transfer Expenses" incurred by FNMA and Midlantic in connection with the transfer of the FNMA portfolio from NYGMC to Midlantic. The "Transfer Expenses" described by Account 8 are defined to include the following categories of expenses:

> *Transfer Expenses.* The balance in this Account shall equal the actual out-of-pocket expenses incurred by Fannie Mae and its agent, Midlantic Home Mortgage Corporation (the "Agent") in effecting the transfer of the loan portfolio from NYGMC to Fannie Mae as described in this Agreement which are in excess of the expenses customarily incurred by the purchaser of a loan portfolio and that resulted from the unique situation encountered in the transfer of the servicing rights under the Contract.

1. Payments Made by FNMA Under the Agreement

Sections 2.4 and 2.5 of the Agreement provide that FNMA is to pay the $8,799,187 purchase price, plus or minus the balances in the 14 Accounts, in two separate installments: the "First Adjusted Payment" (August 31, 1990) and the "Final Adjusted Payment" (January 31, 1990). To determine the amounts which were due on these dates, the Accounts were to be reconciled as of July 31, 1990 and December 31, 1990, respectively. (Sections 2.2, 2.4 and 2.5 of the Agreement, Walker Aff. Ex. B).

On November 13, 1990, FNMA forwarded NYGMC a check for $922,106.47 to reflect the first payment due under the Agreement. This payment represented 25% of the total estimated amount due and owing to NYGMC, with the balances in the 14 Accounts reconciled as of November 5, 1990. (Pearce Aff. ¶ 12 and Ex. E). The reconciliation statement provided by FNMA listed the total net value of the Accounts as $5,110,758.12 and stated that FNMA still owed NYGMC a remaining balance of $3,688,428.88 based on the difference between the purchase price of $8,799,-187 and the Account balance of $5,110,-758.12. (Pearce Aff. Ex. E).

2. Reconciliation Statements Submitted by FNMA

The Account balances enumerated in the November 5th reconciliation statement were generally within the range of values previously estimated in FNMA's schedules. The "Transfer Expense" offset [Account 8], which is now the subject of this proceeding, contained a November 5th reconciliation balance of $150,000. This figure is consistent with the schedules previously submitted by FNMA during the negotiations preceding the Agreement.

Even after the issuance of the November 5th reconciliation statement, FNMA's schedules continued to project Account 8 "Transfer Expenses" at between $100,000 and $150,000. (Pearce Aff. Exs. D and E). In schedules submitted by FNMA between November 5, 1990 and February 28, 1991, the estimated "Out-of-Pocket Transfer Expenses" never exceeded $150,000 and the actual expenses, as reported by FNMA, were never in excess of $118,687.02.

**FNMA's Estimated and Actual**
**Account 8 "Transfer Expenses"**

| Date of FNMA Schedule | Estimated | Actual |
| --- | --- | --- |
| November 5, 1990 | $150,000 | —— |
| November 14, 1990 | 150,000 | 118,687.02 |
| November 19, 1990 | 150,000 | —— |
| December 18, 1990 | 150,000 | 118,687.02 |
| December 31, 1990 | 150,000 | —— |
| January 11, 1991 | 150,000 | 118,687.02 |
| February 14, 1991 | 150,000 | 118,687.02 |
| February 28, 1991 | 150,000 | 118,687.02 |

(Pearce Reply Aff. Exs. D and E).

---

### The Disputed Offset by FNMA

As part of its interim servicing agreement with Midlantic, FNMA was charged a one-time fee of $4,530,741 to compensate Midlantic for taking over the servicing responsibilities of the FNMA mortgage portfolio. (Carpenter Aff. Ex. A, at 4). This fee, which was payable on December 31, 1990, was calculated using the unpaid principal balance at the end of each month of the Midlantic Agreement. Although the Midlantic Servicing Fee was never included in any of the extensive schedules or reconciliation statements previously submitted by FNMA, FNMA nonetheless sought to apply the Midlantic Fee as an offset against the remaining balance due NYGMC.

Accordingly, on January 15, 1991, FNMA notified John C. Pearce, III, the consultant hired by Soroka, that FNMA was now entitled to a credit of $4,530,741 to reflect the 50 basis point fee paid to Midlantic. (Pearce Aff. ¶ 13). FNMA promptly offset the $4,530,741 payment against the remaining balance of $3,688,428.88,[2] and advised the Receiver's consultant that no funds would be due NYGMC under the Agreement.

Later that day, FNMA forwarded to NYGMC a new reconciliation schedule in which it listed the Midlantic Payment as a *new* offset Account entitled "Servicing Fee." (Pearce Aff. Ex. F, Schedule dated January 11, 1991). Ironically, that very same schedule also contains a separate category entitled "Out-of-Pocket Transfer Expenses", for which it estimates expenses to be only $150,000. It was not until March 7, 1991 that FNMA, for the first time, claimed the Midlantic payment as an offset under Account 8 ["Transfer Expenses"].

### The Receiver's Application

On January 23, 1991, counsel for the Receiver wrote to FNMA, informing it that this $4.5 million "deduction" was never agreed to by the parties and was certainly never disclosed to NYGMC when it entered into the Agreement with FNMA. FNMA did not respond to counsel's letter and, on February 13, 1991, Michael Soroka applied to this court for "Enforcement of the Agreement between the Independent Receiver and FNMA" dated August 13, 1990 (the "Receiver's Application"). Specifically, the Receiver argues that FNMA is in breach of the Agreement and that the $4.5 million Servicing Fee that FNMA now wishes to deduct from the purchase price is an impermissible attempt by FNMA to rewrite the Agreement as executed and approved by this court.

The Receiver's Application seeks the following relief: (1) enforcement of the Agreement between NYGMC and FNMA; (2) a definitive interpretation of Account 8;

---

**2.** The remaining balance of $3,688,428.88 is the difference the $8,799,187 purchase price and the November 5, 1990 Account reconciliation balance of $5,110,758.12. (Soroka App. Ex. E).

(3) an order directing FNMA to pay NYGMC the sum of $2,766,322.41 with interest from January 31, 1991;[3] and (4) an order compelling FNMA to provide the Receiver with a Preliminary Account Statement as of January 31, 1991 (with supporting documentation) reflecting the final Account balances of December 31, 1990.[4] Such a statement is deemed necessary by the Receiver because it would provide the basis for determining the amount of the Final Adjusted Payment.

### FNMA's Cross-Application

On March 8, 1991, FNMA filed a Cross-Application seeking to dismiss Soroka's Application or, in the alternative, to construe Account 8 to include the Midlantic Servicing Fee. In addition, FNMA seeks an order directing the Receiver to: (1) return the $922,106.47 previously paid on November 13, 1990; and (2) pay FNMA an additional $802,782.22 to reflect the excess of the Account balances (which would include the Midlantic Servicing Fee) over the purchase price. As part of its Cross-Application, FNMA seeks dismissal of the Receiver's Application on the ground that the matters raised in it should be resolved in a plenary action and not in a "summary proceeding".

### FNMA's Complaint

Subsequent to the filing of the Receiver's Application and FNMA's Cross-Application, a second, unrelated dispute arose between FNMA and Soroka. The second dispute arises out of the Receiver's refusal to pay approximately $1.46 million in insurance proceeds from the FDIC which were paid to the Receiver as custodian and agent for FNMA. On March 27, 1991, the FDIC delivered to the Receiver, as custodian for

FNMA and others, a series of checks totalling $1,457,994.86. Three of these checks, totalling $1,398,552.47 were made payable to "NYGMC as Custodian for FNMA"; a separate check in the amount of $59,442.45 was made payable to "NYGMC as Custodian for FNMA and Various Credit Life Ins. Companies."

The FDIC checks represent payment to FNMA on insurance claims processed by the Receiver on behalf of FNMA, pursuant to Account 4 of the Agreement. Account 4 establishes as an offset certain unclaimed insurance funds due to FNMA that were on deposit at Guardian Bank and frozen by the FDIC. Account 4 further provides that defendant Soroka, either of his own volition or upon request of FNMA, would complete the filing of FNMA's insurance claims with the FDIC, and that "[a]ll amounts paid to the Independent Receiver in respect of [these claims] will [be] remitted to FNMA immediately upon receipt."

The FDIC insurance checks were delivered to Soroka on March 27, 1991. As was their right under the Agreement, FNMA requested that Soroka arrange for the endorsement and immediate delivery of the checks over to FNMA. (Compl. ¶ 28). On April 4, 1991, Soroka notified FNMA that he was refusing this request and, instead, would hold the funds in a segregated account pending resolution of his own Application before the court. It is Soroka's belief that FNMA is in breach of the August 13, 1990 Agreement and that such breach entitles him (as Receiver for NYGMC) to retain the FDIC insurance proceeds that were collected by him as custodian and agent for FNMA.[5]

As a result of the Receiver's refusal to release the FDIC insurance proceeds,

---

3. The Receiver's Application does not clearly explain how it arrived at this figure. Apparently, this figure represents the difference between the $3,688,428.88 balance due NYGMC (as indicated on the November 5th reconciliation) less the initial $922,106.47 payment made to NYGMC on November 13, 1990. (Pearce Aff. ¶ 19 and Ex. E).

4. Within 30 days of the final December 31, 1990 Adjustment Date, FNMA was required to submit to NYGMC a Preliminary Account Statement

which sets forth FNMA's "good faith determination" of the outstanding balances in each Account as of such date. (Section 2.3 of the Agreement, Walker Aff. Ex. B, at 6). FNMA has, thus far, failed to provide such a statement. (Pearce Aff. ¶ 17).

5. The alleged breach arises out of FNMA's refusal to remit the approximately $2.7 million which Soroka contends is still due the Receivership estate (NYGMC) under the Agreement.

FNMA has commenced this plenary action against the Receiver seeking both declaratory relief and monetary damages. The complaint alleges that: (1) Soroka and NYGMC breached Account 4 of the Agreement by failing to arrange for the immediate delivery of the FDIC insurance proceeds upon FNMA's request; and (2) Soroka, "as custodian and agent for FNMA," breached his fiduciary duty by refusing FNMA's request and improperly retaining the insurance proceeds in the Receivership estate.

FNMA's complaint also seeks resolution of the parties' dispute concerning the meaning and interpretation of Account 8. It is FNMA's position that the $4,530,741 Midlantic Servicing Fee constitutes a "Transfer Expense" within the meaning of Account 8, thereby entitling FNMA to offset this amount against the purchase price due NYGMC under the Agreement. Because this new offset will cause the balances in the 14 Accounts to exceed the $8,799,187 purchase price by $1,724,888.69, FNMA also requests that Soroka and NYGMC immediately return the $922,-106.47 interim payment previously made by FNMA (November 13, 1990) and pay FNMA the additional amount of $802,-782.22 (to reflect the excess of the Account balances over the purchase price).

### Soroka's Motion to Dismiss

On September 13, 1991, Michael Soroka filed a motion to dismiss FNMA's complaint pursuant to Fed.R.Civ.P. 12(b), 41(b), 66 and the inherent powers of this court or, in the alternative, to stay the action pending a determination of the Receiver's Application and FNMA's Cross–Application.

In support of his motion to dismiss, Soroka argues that: (1) FNMA never sought nor secured permission from this court to sue the Receiver, as is required by Fed. R.Civ.P. 66; (2) there is no reason to permit FNMA to proceed simultaneously with a separate proceeding involving the same subject and issues identical to those raised by the earlier Application and Cross–Application; (3) the issues of contract interpretation which underly this dispute can be fully

and fairly resolved in a summary proceeding; and (4) the complaint fails to state a claim for relief against him in his individual capacity.

### DISCUSSION

The dual proceedings before this court involve multifarious claims and defenses, as well as a variety of complex legal issues. In the interest of judicial economy, we will consolidate all the various applications and motions made by the parties, and consider separately each issue.

### The Use of Summary Proceedings

■ The first issue raised by the parties concerns the court's authority to use "summary proceedings" to interpret and enforce the terms of the 1990 Agreement. The case law regarding a district court's administration of an equity receivership is sparse and usually limited to the facts of the particular case. *See S.E.C. v. Hardy,* 803 F.2d 1034 (9th Cir.1986). Nevertheless, one common thread keeps emerging out of the cases involving equity receiverships—that is, a district court has extremely broad discretion in supervising an equity receivership and in determining the appropriate procedures to be used in its administration. *See, e.g., Hardy,* 803 F.2d at 1037; *S.E.C. v. Lincoln Thrift Ass'n,* 577 F.2d 600, 606 (9th Cir.1978); *S.E.C. v. Safety Finance Service, Inc.,* 674 F.2d 368, 373 (5th Cir. 1982). *See also* 7 J.W. Moore, *Moore's Federal Practice,* ¶ 66.08[4] (2d ed.1991).

■ In keeping with this broad discretion, "the use of summary proceedings in equity receiverships, as opposed to plenary proceedings under the Federal Rules [of Civil Procedure], is within the jurisdictional authority of a district court." *Hardy,* 803 F.2d at 1040; *S.E.C. v. Wencke,* 783 F.2d 829, 836 (9th Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 77, 93 L.Ed.2d 33 (1986); *S.E.C. v. Universal Financial,* 760 F.2d 1034, 1037 (9th Cir.1985); *United States v. Arizona Fuels Corp.,* 739 F.2d 455, 458 (9th Cir.1984). Such procedures "avoid formalities that would slow down the resolution of disputes. This promotes judicial efficiency and reduces litigation costs to

the receivership," *Wencke,* 783 F.2d at 837 n. 9, thereby preserving receivership assets for the benefit of creditors. *See also* 2 R. Clark, *Law on Receivers,* § 584 (3d ed. 1959). Although the use of summary proceedings, in some cases, would deprive parties of a full and fair opportunity to prepare their claims and defenses, such a danger is not present here as both parties have been given an ample opportunity to prepare and present their contentions.

■ In its Cross–Application, FNMA contests this court's jurisdiction to enforce the Agreement in a summary proceeding, claiming that it is neither a party to the action nor a party to the receivership proceeding. We disagree. By entering into the Agreement with the Receivership, FNMA has made itself a "party" to these proceedings for purposes of enforcement of the Agreement. *See* 2 R. Clark, *Law on Receivers,* § 433.1 (3rd ed.1959). "A party contracting with the receiver becomes a quasi party instead of a stranger to the record, and subjects himself for the purposes of the contract to the orders of the court." *Id.* at 727 (citing *In re Hollingsworth & Whitney Co.,* 242 F. 753 (1st Cir.1917)). This court is, therefore, empowered to determine in a summary proceeding the rights and obligations of the parties to the contract, particularly when the issues presented involve a simple matter of contract interpretation.

### Interpreting the Contract

We turn next to the paramount issue raised by the Receiver's Application and FNMA's Cross–Application—that is, whether the $4.5 million Servicing Fee paid by FNMA to Midlantic constitutes a "transfer expense" within the meaning of Account 8 of the Agreement. Account 8 permits FNMA to offset against the purchase price any "Transfer Expenses" incurred by FNMA in connection with the June 1989 portfolio transfer:

> Account 8. *Transfer Expenses.* The balance in this Account shall equal the actual out-of-pocket expenses incurred by Fannie Mae and its agent, Midlantic Home Mortgage Corporation (the

"Agent"), in effecting the transfer of the loan portfolio from NYGMC to Fannie Mae as described in this Agreement which are in excess of the expenses customarily incurred by the purchaser of a loan portfolio and that resulted from the unique situation encountered in the transfer of servicing rights under the Contract.

(Walker Aff. Ex. B, at 5).

The critical language in this provision is the phrase "actual out-of-pocket expenses." We must determine whether this phrase can be construed to encompass the "Servicing Fee" paid to Midlantic under the interim servicing agreement. In making this determination, we must first make reference to the contract alone. *Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509 (2d Cir.1990); *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 646 477 N.E.2d 1099, 1100 (1985). Only when the language of the contract is "ambiguous" may a court turn to extrinsic evidence of the contracting parties' intent. *Curry Road,* 893 F.2d at 511; *International Klafter Co., Inc. v. Continental Casualty Co., Inc.,* 869 F.2d 96, 100 (2d Cir.1989).

■ The determination of whether a contract is "ambiguous"—and thus whether parol evidence may be considered—is a question of law for the court to decide. *Curry Road,* 893 F.2d at 511; *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). A contractual term is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of customs, practices, usages and terminology as generally understood in the particular trade or business." *United States Fire Insurance Co. v. General Reinsurance Corp.,* 949 F.2d 569, 572 (2d Cir.1991); *Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509 (2d Cir.1990). When interpreting a contractual provision, courts are to give words their "natural and reasonable" meaning. *Lackey v. Whitehall Corp.,* 704 F.Supp. 201, 206 (D.Kan.1988).

■ With these principles in mind, we find the phrase "actual out-of-pocket expenses" [incurred by FNMA and Midlantic in effecting the transfer of the loan portfolio from NYGMC to FNMA] to be clear and unambiguous. As used in this context, "actual out-of-pocket expense" means the tangible costs associated with the "physical transfer" of portfolio documents from NYGMC to FNMA, such as the rental of a ballroom in which to house and organize the documents. It is not an expense which is linked to the fee paid Midlantic for actually "servicing" the portfolio. *Cf. Thompson v. C.H.B., Inc.,* 454 So.2d 55, 56 (Fla. Dist.Ct.App.1984) ("[w]ith no help contained in the contract as to what was intended by 'out of pocket expenses,' we give the term its literal meaning and say that it means money coming out of the Thompsons' pocket in furtherance of the corporate purpose"); *Lind Investments Corp. v. Seegers,* 67 Ill.App.2d 129, 213 N.E.2d 593 (1966) (cost of supervision, accounting services, and rental of equipment are items included within the concept of "out of pocket" expenses).

■ Even if "Transfer Expenses" or "Actual out-of-pocket expenses" were deemed to be ambiguous terms, the court may still consider parol evidence for the purpose of explaining the writing. *See Investors Insurance Co. of America v. Dorinco Reinsurance Co.,* 917 F.2d 100, 104 (2d Cir.1990); *Burger King Corp. v. Horn & Hardart,* 893 F.2d 525, 527 (2d Cir.1990). In such cases, a court will look to "the acts and circumstances surrounding execution of the ambiguous term" in order to ascertain the parties' intent. *Roberts v. Consolidated Rail Corp.,* 893 F.2d 21, 24 (2d Cir.1989); *Bray Terminals, Inc., v. Grand Union Co.,* 74 A.D.2d 965, 966, 425 N.Y.S.2d 886, 888 (3rd Dep't 1980).

A close examination of the extrinsic evidence before us suggests that the parties never intended to include the Midlantic Servicing Fee as an offset under Account 8. Four factors, in particular, suggest this:

(1) schedules submitted by FNMA during the contract negotiations; (2) schedules submitted by FNMA during the execution of the Agreement; (3) the timing of the claimed offset; and (4) the $922,106.47 interim payment made by FNMA on November 13, 1990.

### 1. Schedules Submitted During the Negotiations

The Midlantic Servicing Fee was never included in any of the extensive schedules or calculations submitted by FNMA during the parties' year-long contract negotiations. Between August 1989 and August 1990, FNMA submitted a series of schedules to NYGMC labeling 14 Accounts as "holdbacks" and itemizing the approximate dollar values of those Accounts. It is worth noting that every schedule submitted by FNMA during that time period consistently estimates "Out-of-Pocket Transfer Expenses" to be only $100,000. (Pearce Reply Aff.Ex. C). Although this does not constitute a waiver of FNMA's right to bring a claim, it certainly bears strongly on their intent.

### 2. Schedules Submitted Post–Execution

FNMA's actions subsequent to the execution of the Agreement also belie any inference that the parties intended to include the Midlantic Servicing Fee as part of Account 8. Pursuant to Section 2.3 of the Agreement, FNMA provided statements of the Account balances to NYGMC from September 1990 through February 1991. These statements consistently showed that the actual transfer expenses never exceeded $118,687.02 and that, as of September 30, 1990, they were fixed at $118,687.02. Although the Midlantic Servicing Fee was not "payable" until December 31, 1990, the fee was certainly capable of calculation well before that date and could conceivably have been scheduled as an "estimated" expense on prior schedules.[6]

---

**6.** A simple projection of the portfolio's outstanding principal balances on a monthly basis over the term of the Midlantic Servicing Agreement would have produced a reasonably precise estimate of the servicing fee. (Pearce Reply Aff. ¶ 16).

### 3. Timing of the Claimed Offset

The timing of FNMA's claimed offset raises additional suspicions about whether the parties' ever intended to include "servicing fees" in Account 8. Although the Agreement required the final balance in Account 8 to be "fixed" as of September 30, 1990, FNMA did not first inform the Receiver about the $4.5 million Midlantic Servicing Fee until January 15, 1991. Even at that late juncture, FNMA did not try to assert this fee as a "Transfer Expense." In a schedule dated January 11, 1991, FNMA originally listed the Midlantic payment as a *new* offset Account entitled "Servicing Fee." (Pearce Aff. Ex. F). That very same schedule, interestingly enough, also estimated Account 8 "Transfer Expenses" at $150,000.

This line of demarcation endures on later FNMA schedules. Throughout January and February 1991, FNMA's own schedules continued to claim the $4.5 million fee as an *additional* offset under the Agreement. (Pearce Reply Aff. Ex. D). It was not until March 7, 1991 that FNMA, for the first time, found a home for the Midlantic Fee in Account 8. This unexplained change in position, which ironically occurred the day before FNMA served its Opposition Papers to the Receiver's Application, is further evidence that the parties never contemplated the Midlantic payment as an offset under Account 8.

### 4. The Interim Payment Made by FNMA

On November 13, 1990, FNMA made an interim payment of $922,106.47 to NYGMC. This payment, which was calculated using the Account reconciliation balances of November 5, 1990, further demonstrates that FNMA never intended to offset the Midlantic Servicing Fee as a "Transfer Expense." Not only was the Midlantic Fee known to FNMA as of the November 5th reconcilia-

tion date, but it was calculable as well.[7] It, therefore, stands to reason that if the $4.5 million Midlantic Payment were an appropriate deduction under Account 8, then no money would have been paid or payable to NYGMC in November or at any time thereafter.

### Nonperformance Following a Material Breach

■ Having decided that FNMA was not entitled to offset the Midlantic Servicing Fee as a "transfer expense", it follows that the Receiver's refusal to remit the FDIC insurance proceeds was justified. It is a well-settled principle of contract law that a material breach "excuses" the non-breaching party from performing its contractual obligations. *See Printers II, Inc. v. Professionals Pub. Inc.*, 784 F.2d 141, 148 (2d Cir.1986); *Rochdale Village, Inc. v. Public Service Emp. Union*, 605 F.2d 1290, 1297 (2d Cir.1979); *Branko Intl., Inc. v. Saudi Arabian Airlines*, 704 F.Supp. 386, 390 (S.D.N.Y.), *aff'd*, 880 F.2d 1318 (2d Cir. 1989). Ceasing performance under these circumstances is justifiable:

> [s]ince performance of a contract is usually a constructive condition of each obligor's promise, lack of performance will relieve an obligor of his duty to honor the contract. If either party believes there has been a failure of the constructive condition of performance, he is entitled to cease performing, subject only to the duty to pay contractual damages if his belief is later adjudicated to be erroneous.

*Printers II*, 784 F.2d at 148.

We have no doubt that the Receiver was contractually required to turn over the FDIC insurance proceeds on April 1, 1991.[8] The specific language in Account 4 makes that very clear. However, this duty was

---

7. The Midlantic Servicing Fee was calculated by using the month-end principal balances over the 18 month period between June 30, 1990 and December 1991. By August 13, 1990, when the Agreement with the Receiver was executed, at least thirteen months had already elapsed under the Midlantic Agreement. Therefore, according to figures provided by the Receiver, FNMA could have reasonably estimated almost $3.6

million of this fee on its schedules and reconciliations. (Goldenberg Aff. ¶ 12). It chose not to, however.

8. On April 1, 1991, FNMA for the first time requested that Soroka arrange for the endorsement and immediate delivery of the FDIC checks. (Compl. ¶ 28).

conditioned on FNMA's earlier duty to pay NYGMC the remainder of the purchase price on January 31, 1991. (Section 2.5 of the Agreement, Walker Aff. Ex. B). By failing to tender the remaining balance on that date, FNMA committed a breach which went to the very heart of the Agreement—the purchase price. Because this breach was "material", Soroka acted justifiably in withholding FNMA's insurance proceeds pending determination of the Receiver's Application. That FNMA may have had a good faith belief in its interpretation of the contract is irrelevant.

For these reasons, the breach of contract claim against defendants Soroka and NYGMC must be dismissed.

### FNMA's Complaint

With the issues of contract interpretation having now been resolved, we turn next to the remaining issue raised by FNMA's complaint—whether Soroka breached his fiduciary duty by retaining the FDIC insurance proceeds pending this court's determination of the Receiver's Application. The principal argument advanced by Soroka, in support of his motion to dismiss, is that FNMA's complaint fails to state a claim against him in his individual capacity.[9]

### 1. Motion to Dismiss Standard

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court deems as true the facts alleged in the complaint and views them in the light most favorable to the plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir. 1985). The complaint must stand "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The Federal Rules of Civil Procedure, however, do require a short and plain statement of the claim "that will give the defendant[s] fair notice of what the plaintiff[s']

claim is and the grounds upon which it rests." *Id.,* 355 U.S. at 47, 78 S.Ct. at 103. *See* Fed.R.Civ.P. 8(a)(2).

### 2. Personal Liability of a Receiver

■■ We find no basis to support a breach of fiduciary duty claim against the Receiver personally. As a general rule, actions against a receiver are not against the receiver personally, but are against the "receivership" or the "funds" in the receiver's possession. *See McNulta v. Lochridge,* 141 U.S. 327, 332, 12 S.Ct. 11, 13, 35 L.Ed. 796 (1891); *Goff v. Will County Natl. Bldg. Corp.,* 311 Ill.App. 207, 35 N.E.2d 718 (1941). Only in the rarest of situations may a receiver be sued in his personal or individual capacity—when he has acted outside the scope of his authority. *See McNulta,* 141 U.S. at 332, 12 S.Ct. at 13; *New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298, 1303 (9th Cir.1989); *Morrison–Knudsen Co., Inc. v. CHG Intern., Inc.,* 811 F.2d 1209, 1222 (9th Cir. 1987); *Ziegler v. Pitney,* 139 F.2d 595, 596 (2d Cir.1943). *See also* 2 R. Clark, *Law of Receivers,* § 394 at 662–63 (3d ed.1959).

■■ FNMA's complaint does not set forth a single fact to suggest that Soroka acted *ultra vires.* The essential allegations are that: (1) Mr. Soroka entered into an Agreement as Independent Receiver of NYGMC; (2) certain monies were delivered to "Soroka, as Independent Receiver and agent for FNMA"; and (3) certain monies allegedly due FNMA under the Agreement were not remitted to it. There is nothing in the complaint which suggests that Mr. Soroka acted other than in his capacity as Receiver, that he undertook any act in his individual capacity, or that he favored himself at the expense of the receivership estate. Although FNMA was legally entitled to the FDIC insurance proceeds pursuant to Account 4, Soroka's decision to withhold the money pending resolution of the Receiver's Application did not transform his conduct into an *ultra vires* act. *C.f. Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 693–95, 69 S.Ct. 1457,

---

**9.** By virtue of his being named in the caption of the complaint "individually and in his representative capacity", we assume that FNMA seeks recovery from Mr. Soroka personally.

1463–64, 93 L.Ed. 1628 (1949) (for the purpose of a sovereign immunity analysis, a government official does not commit an *ultra vires* act by wrongfully withholding plaintiff's property under an otherwise authorized contract).

## CONCLUSION

With respect to the Receiver's Application and FNMA's Cross Application, we find that: (1) this court is empowered with the authority to determine, in a summary proceeding, the rights and obligations of the parties with respect to the contract entered into between FNMA and the Independent Receiver on August 13, 1990; (2) the $4,530,741 Serving Fee paid by FNMA to Midlantic is not a "Transfer Expense" within the meaning of Account 8 of the Agreement; (3) FNMA's attempt to apply the Midlantic Servicing Fee as an offset against the purchase price constitutes a material breach of the August 13, 1990 Agreement; (4) such breach excuses the Receiver from complying with the provisions of Account 4 pending a full settlement of all the Accounts; and (5) FNMA has not complied with section 2.3 of the Agreement which requires that FNMA submit to NYGMC a Preliminary Account Statement setting forth the final Account balances as of December 31, 1990.

## ORDER

Defendant's motion to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b) and the inherent powers of this court, is granted. The Clerk of the Court is directed to enter judgment in favor of defendants Michael H. Soroka and The New York Guardian Mortgagee Corporation dismissing the complaint of the Federal National Mortgage Association without prejudice. In addition, FNMA is ordered to submit to the Independent Receiver within twenty (20) days a Preliminary Account Statement setting forth the final Account balances as of December 31, 1990. At the conclusion of this twenty day period, FNMA is to immediately remit whatever balance is owed NYGMC with interest payable from January 31, 1991.

SO ORDERED.