**VANGUARD MUNICIPAL BOND FUND, INC., et al.,**
Plaintiffs,

v.

**CANTOR, FITZGERALD L.P., et al., Defendants.**

**No. 97 Civ. 6874 (SHS)(AJP).**

United States District Court,
S.D. New York.

March 22, 1999.

Scott Gene Early, Foley & Lardner, Chicago, IL, Joseph G. Reimer, Richard C. Raymond, Reimer & Raymond, LLP, New York City, for plaintiffs.

James F. Rittinger, Satterlee Stephens Burke & Burke, New York City, for defendants.

### ORDER

STEIN, District Judge.

In a Report and Recommendation dated December 21, 1998, Magistrate Judge Andrew J. Peck recommended that defendants' motion to dismiss the complaint or in the alternative for summary judgment be granted.

After a *de novo* review of Magistrate Judge Peck's Report and Recommendation dated December 21, 1998,

IT IS HEREBY ORDERED that that Report and Recommendation is adopted by this Court, and that defendants' motion for summary judgment dismissing the complaint is granted.

SO ORDERED.

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Plaintiffs Vanguard Municipal Bond Fund, Vanguard Ohio Tax–Free Fund, Vanguard New York Insured Tax–Free Fund, Vanguard New Jersey Tax Free Fund, Vanguard Pennsylvania Tax–Free Fund, Vanguard Fixed Income Securities Fund and Vanguard Admiral Funds (collectively "Vanguard"), mutual funds and members of the Vanguard Group of Investment Companies, are suing defendants Cantor Fitzgerald Municipal Brokers, Chapdelaine & Co., J.F. Hartfield & Co., J.J. Kenny Drake, Municipal Partners and Titus & Donnelly (collectively the "Pricing Brokers") for negligence and negligent misrepresentation arising out of the Pricing Brokers' December 19, 1995 pricing of The Bond Buyer Municipal Bond Index (the "BBI"), against which Vanguard's December 1995 Long–Term Municipal Bond Index Futures Contracts were settled. The Pricing Brokers have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment. For the reasons set forth below, because the Pricing Brokers' did not owe any duty to Vanguard, I recommend that the Court grant defendants' motion.[1]

### FACTS

#### Long–Term Municipal Bond Index Futures Contracts

In 1985, the Chicago Board of Trade (sometimes referred to herein as the "CBOT") created and began trading in Long–Term Municipal Bond Index Futures Contracts ("Futures Contracts"). (2d Am.Compl. ¶ 20.) Futures Contracts "are issued and trade with various monthly settlement (*i.e.*, expiration) dates.... The price at which [Futures Contracts] settle on their respective expiration dates is established by reference to the BBI." (2d Am.Compl. ¶¶ 22–23; *see also* Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 3; Affidavit of Carol Burke, V.P. of Chicago Board of Trade, ¶ 2.)

The Chicago Board of Trade has promulgated regulations to govern the trading of Futures Contracts. (*See* Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 4; Burke Aff. ¶ 3 & Ex. A: Chapter 19 of the CBOT Regulations.) As provided in Regulation 1950.01(a), the BBI is comprised of 40 long-term municipal bonds (the "Constituent Bonds") that "must meet various

1. The Court notes that because both parties have submitted material outside the pleadings, the Court will consider the motion as a summary judgment motion. The Court is limiting its decision, however, to the issue raised in the motion to dismiss, *i.e.*, whether plaintiffs have alleged the elements of a negligent misrepresentation claim, and is not reaching the issue of whether, in fact, defendants were negligent, about which plaintiffs contend that they would need discovery.

criteria as to size, rating, maturity and other factors." (2d Am.Compl. ¶ 24; *see also* Pricing Brokers & Vanguard Rule 56.1 Stmts. at ¶¶ 4–5; Affidavit of Matthew Kreps, Statistics Editor at *The Bond Buyer*, ¶ 5; Burke Aff.Ex. A at Reg. 1950.01(a).) The BBI is calculated by and published in *The Bond Buyer*, pursuant to Regulation 1950.01(b) and agreement with the Chicago Board of Trade, which granted The Bond Buyer "a license to compute and publish the BBI in accordance with price evaluations submitted by major municipal bond dealer-to-dealer brokers." (2d Am.Compl. ¶¶ 23, 25; *see also* Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶¶ 7, 9 12; Burke Aff. ¶ 9 & Ex. A at Reg. 1950.01(b); Burke Aff. Ex. B: 1985 CBOT—Bond Buyer Agreement.) [2] Each day, the prior day's BBI is published in *The Bond Buyer*. (Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 2; Kreps' Aff. ¶¶ 2, 3.)

Each of the Pricing Brokers entered into a contract with the CBOT—Bond Buyer partnership ("Pricing Broker Contract") to perform price evaluations "for the purpose of permitting The Bond Buyer[ ] to compute the value of the BBI." (2d Am.Compl. ¶ 26; Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶¶ 11, 14; Burke Aff. ¶¶ 9, 12; Poto Cantor Fitzgerald) Aff. ¶¶ 3, 6; Hoerrner (Chapdelaine) Aff. ¶¶ 3, 6; Byram (J.J. Kenny) Aff. ¶¶ 3, 6; Caffrey (Titus & Donnelly) Aff. ¶¶ 3, 6; Cashman (Municipal Partners) Aff. ¶¶ 3, 6; Epstein (Hartfield) Aff. ¶¶ 3, 6. Under the Pricing Broker Contracts, the Pricing Brokers:

> (b) undertake to provide accurate actual price quotations for the Constituent Bonds or, in the event there is not a sufficient volume of timely and current trading activity in such bonds, to provide an evaluation of what actual price quotations would have been had there been a sufficient volume of trading activity;
>
> (c) expressly represent and warrant the accuracy of the actual and evaluated price quotations the Pricing Brokers submit; . . .

(2d Am.Compl. ¶ 26; *see* Burke Aff. Exs. G–L: Pricing Broker Contracts ¶¶ 2.1, 2.2.) The Pricing Broker Contracts provide for compensation to the Pricing Brokers based on a formula that takes into account the number of quotations they submit plus a "bonus" based on the "average daily trading volume of futures contracts." (2d Am.Compl. ¶ 26; Burke Aff. Exs. G–L, ¶¶ 4.1, 4.4.)

Pursuant to Regulation 1950.01(b) and the Pricing Broker Contracts, the Pricing Brokers evaluate the price of the Constituent Bonds twice each day in order that the Bond Buyer may compute the BBI twice daily. (2d Am.Compl. ¶ 28; Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 14; Burke Aff.Ex. A at Reg.1950.01(b); Poto Aff. ¶¶ 4–5; Hoerrner Aff. ¶¶ 4–5; Byram Aff. ¶¶ 4–5; Caffrey Aff. ¶¶ 4–5; Cashman Aff. ¶¶ 4–5; Epstein Aff. ¶¶ 4–5.) The

**2.** Regulation 1950.01(b) provides, in pertinent part:

> (b) Index Computation—The Bond Buyer shall compute the closing value of the [BBI] each day the municipal bond cash market is open using the following procedures:
>
> 1. Price Evaluation—At least four major municipal bond dealer-to-dealer brokers, who broker the type and variety of bonds fully representative of [the BBI] shall evaluate the price of each bond in the [BBI] daily. An evaluation shall be defined as the broker's assessment of the price at which a minimum $100,000 or higher face value of each of such bonds could be sold in the cash market between 1:45 p.m. and 2:00 p.m. Chicago time (2:45 p.m. and 3:00 p.m.

New York time). Beginning on the first business day of the delivery month and continuing through the day the current contract expires, the brokers shall also evaluate the price of each bond between 10:45 a.m. and 11:00 a.m. Chicago time (11:45 a.m. and 12:00 noon New York time), in order that The Bond Buyer may compute the [BBI] twice daily. . . .

> 2. Computation—The Bond Buyer shall compute the median value for each bond. The median value is defined as the price arrived at by dropping the one highest and the one lowest price evaluations and calculating the simple average (mean) of the remaining price evaluations. . . .

Pricing Brokers submit the morning valuation between 11:45 a.m. and 12:00 p.m. New York time and the afternoon valuation between 2:45 p.m. and 3:00 p.m. New York time. (2d Am.Compl. ¶ 28; Kreps Aff. ¶ 6; Poto Aff. ¶ 4; Hoerrner Aff. ¶ 4; Byram Aff. ¶ 4; Caffrey Aff. ¶ 4; Cashman Aff. ¶ 4; Epstein Aff. ¶ 4.)

"Any member of the investing public may purchase or sell a CBOT Futures Contract[ ], which are valued at $1,000.00 times the BBI." (Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 16; *see also* Burke Aff.Ex. A at Reg.1904.01.) Vanguard does not dispute that any member of the investing public may purchase or sell a Futures Contract but adds that since the value of each Futures Contract exceeds $100,000, "[f]or the most part, ... Futures contracts are regularly and routinely traded by sophisticated investors." (Vanguard Rule 56.1 Stmt. ¶ 16; *see also* Affidavit of Anthony Jiorle, a Principal of Vanguard, dated 6/8/98, ¶ 6.)

"Pursuant to the CBOT's regulations, futures contracts expire on a specified date during one of four 'settlement months'—March, June, September or December of a given year." (Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 16; *see also* Burke Aff.Ex. A at Reg.1905.01.) The December Futures Contracts expired on December 19, 1995. (2d Am. Compl. ¶ 32.) Prior to the expiration date, prices for Futures Contracts are set in the open market by buyers and sellers in Futures Contracts. (2d Am.Compl. ¶ 30.) "There is virtually no trading in [Futures Contracts] on its Expiration Date." (2d Am.Compl. ¶ 30.) The settlement price for a Futures Contract is set by reference to the afternoon BBI on its expiration date. (2d Am.Compl. ¶ 30; Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 17; Burke Aff.Ex. A Reg.1942.01.)

### The December 19, 1995 Futures Contracts and Vanguard's Allegations in the Complaint

Vanguard traded in December Futures Contracts and, on December 19, 1995, owned an aggregate of 3,420 December Futures Contracts, which represented 75% of the open December Futures Contracts on that date. (2d Am.Compl. ¶¶ 1, 33–34; Jiorle 6/8/98 Aff. ¶ 7.) Vanguard's complaint alleged the following with respect to the Pricing Brokers' December 19, 1995 afternoon valuations for computation of the BBI:

35. In the week preceding December 19, 1995, there was substantial discussion among market professionals with respect to whether the Federal Reserve Board would take action to reduce interest rates at its scheduled Open Market Committee meeting on December 19, 1995.

36. [B]y December 18, the great majority of analysts believed the Federal Reserve Board would take no action, due principally to the federal budget impasse which had led to a partial shutdown of the federal government on December 18.

. . . .

38. Notwithstanding the prevailing opinion in the market, at approximately 2:15 p.m. New York time on December 19, 1995, the Federal Reserve Board announced that its Open Market Committee had reduced the federal funds rate by 25 basis points (one quarter of one percent).

39. Reaction to the Federal Reserve Board announcement was sharp and immediate. Within minutes of the announcement, the Dow Jones Industrial Average had risen by more than 25 points and prices for the bellweather 30-year Treasury bond had increased as well. In fact, stock and bond prices increased across the board immediately following the announcement.

40. Nonetheless, the afternoon (*i.e.,* the 3:00 p.m. E.S.T.) BBI did not reflect any price movement. The morning BBI on December 19, 1995 was 118 19/32. The afternoon BBI that was published at 3:00 p.m.—which was calculated

based on price data submitted by the Defendant Pricing Brokers after the Federal Reserve Board announcement and which set the settlement price for the December [Futures] Contracts—was 118 $^{26}\!/_{32}$, down $^{15}\!/_{32}$ from the previous day's closing.

41. Although the BBI failed to reflect the underlying price movements in the bond markets on the afternoon of December 19, 1995, the prices of other [Futures Contracts] that did not expire that afternoon increased immediately and sharply. . . . .

42. In fact, the BBI did not change until the morning of December 20, when it increased by 1 ⅛ points, notwithstanding that there was relatively little movement in the bond market that morning. (2d Am.Compl. ¶¶ 35–42, emphasis deleted.) Vanguard claims that the Pricing Brokers "did not attempt to evaluate the market or prices for the Constituent Bonds on the afternoon of December 19, 1995. Rather, the Defendant Pricing Brokers merely submitted stale and therefore inaccurate pricing data from that morning . . . ." (2d Am.Compl.¶ 43.) Vanguard alleges that this inaccurate data was based on the Pricing Brokers' mistaken expectation that "there would be little activity in the market due to the fact that the Federal Reserve Board was not expected to take any action to lower interest rates," and the fact that the Pricing Brokers left their offices early on December 19 due to a snowstorm in New York City that afternoon. (2d Am.Compl.¶ 44.)

The Pricing Brokers deny all of these allegations (*see generally* Answer ¶ 24) and assert that, on December 19, 1995, each of the Pricing Brokers "independently evaluated each of the 40 bonds in the BBI between 2:45 p.m. and 3:00 p.m. New York Time" and submitted to The Bond Buyer its "assessment of the price at which $100,-000 or higher face value of each bond could be sold in the cash market" between these times. (Poto Aff. ¶ 8; Hoerrner Aff. ¶ 8; Byram Aff. ¶ 8; Caffrey Aff. ¶ 8; Cashman

Aff. ¶ 8; Epstein Aff. ¶ 8; *see also* Pricing Brokers & Vanguard Rule 56.1 Stmts. ¶ 18, 2d sentence.)

It is undisputed that "Vanguard has not had any contact with any of the defendants whatsoever . . . regarding the transactions that form the subject matter of this action." (Rittinger Aff. Ex. CC: Jiorle 8/5/97 Aff. ¶ 14; *see also* Poto Aff. ¶ 2; Hoerrner Aff. ¶ 12; Byram Aff. ¶ 12; Caffrey Aff. ¶ 12; Cashman Aff. ¶ 12; Epstein Aff. ¶ 12.) The Pricing Brokers were unaware that Vanguard had made investments in the Futures Contract. (*See* Poto Aff. ¶ 12; Hoerrner Aff. ¶ 12; Byram Aff. ¶ 12; Caffrey Aff. ¶ 12; Cashman Aff. ¶ 12; Epstein Aff. ¶ 12.)

### *Procedural History*

In May 1997, Vanguard filed this action in the Northern District of Illinois, asserting claims of breach of contract (as a third-party beneficiary), negligent misrepresentation and fraud. (*See* Am.Compl. at pp. 9–17.)

In June 1997, the Pricing Brokers moved to transfer the case to the Southern District of New York. In opposing the transfer motion, Vanguard argued that New York law "prohibit[s] recovery of persons who suffer economic losses in reliance on [negligent] misrepresentations" by "those in the business of providing information for the guidance of others in commercial transactions". (Rittinger Aff. Ex. BB: Vanguard 8/13/97 Br. at 13.) The Northern District of Illinois transferred the case to the Southern District of New York. (Rittinger Aff.Ex. EE: 8/25/97 Opinion & Order.)

Once in this Court, the parties stipulated that it is "the law of New York that should be properly applied to the claims" in this case, and the parties further agreed that Vanguard could file a second amended complaint. (Rittinger Aff. Ex. AA: 2/27/98 Stip. & Order ¶¶ 3, 5.) Vanguard filed its Second Amended Complaint, which dropped the breach of contract and fraud claims, retained the negligent misrepre-

sentation claim and added a negligence claim. (2d Am.Compl.¶¶ 45–52.)

With regard to the negligence claim, Vanguard alleges that the Pricing Brokers breached their duty to the holders of December Futures Contracts, including Vanguard, when they "negligently and recklessly" submitted inaccurate pricing data on the afternoon of December 19, 1995, resulting in an understatement of the BBI of at least 1.5 points, "which in turn caused the settlement price for the December [Futures] Contracts held by Plaintiffs to be understated by not less than $3,250,-000." (2d Am.Compl.¶¶ 50–51.) As for the negligent misrepresentation claim, Vanguard averred that it relied on the pricing data regularly submitted by the Pricing Brokers to The Bond Buyer, including the negligent misrepresentation of the December 19 afternoon pricing data. (2d Am. Compl.¶¶ 54–56.)

### ANALYSIS

Because both parties have submitted material outside the pleadings, *i.e.,* affidavits and exhibits, this Court will consider defendants' motion as one for summary judgment. (*See also* fn. 1 above.) Furthermore, the Court does not find any substantial difference between Vanguard's negligence and negligent misrepresentation claims and will address them together as a claim for negligent misrepresentation. *See, e.g., Board of Managers of Astor Terrace Condominium v. Schuman, Lichtenstein, Claman & Efron,* 183 A.D.2d 488, 489–90, 583 N.Y.S.2d 398, 399–400 (1st Dep't 1992) (analyzing claims described as "causes of action sounding in negligence" under negligent misrepresentation analysis); *Collins v. Brown,* 129 A.D.2d 902, 904, 514 N.Y.S.2d 538, 540 (3d Dep't 1987) ("Plaintiff's negligence claim is in reality a claim for negligent misrepresentation"); *Goshen v. Mutual Life Ins. Co.,* No. 600466, 95–006, 1997 WL 710669 at * 12 (Sup.Ct.N.Y.Co. Oct. 21, 1997) (dismissing negligent supervision claim as "nothing more than a recast of their claim for negligent misrepresentation").

### I. *SUMMARY JUDGMENT STANDARDS*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991); *Douglas v. Victor Capital Group,* 95 Civ. 6557, 1998 WL 725216 at *8 (S.D.N.Y. Oct.13, 1998) (Stein, D.J. & Peck, M.J.); *Hernandez v. New York City Law Dep't Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047 at *6 (S.D.N.Y. Jan.23, 1997) (Peck, M.J.); *Burger v. Litton Indus., Inc.,* 91 Civ. 0918, 1996 WL 421449 at *7 (S.D.N.Y. April 25, 1996) (Peck, M.J.), *report and rec. adopted by* 1996 WL 609421 (S.D.N.Y. Oct.22, 1996). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, here, the defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994); *Douglas v. Victor Capital Group,* 1998 WL 725216 at *8; *Hernandez v. New York City Law Dep't,* 1997 WL 27047, at *6; *Burger v. Litton,* 1996 WL 421449 at *7.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513; *see also Chambers v. TRM*, 43 F.3d at 36; *Gallo v. Prudential*, 22 F.3d at 1223; *Douglas v. Victor Capital Group*, 1998 WL 725216 at *8; *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *6. The Court draws all inferences in favor of the nonmoving party—here, Vanguard—only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g. Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *Douglas v. Victor Capital Group*, 1998 WL 725216 at *8; *Hernandez v. New York City Law Dep't*, 1997 27047, at *6; *Burger v. Litton*, 1996 WL 421449 at *7. "If, as to the issue on which summary judgement is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM*, 43 F.3d at 37; *see also, e.g., Douglas v. Victor Capital Group*, 1998 WL 725216 at *8; *Hernandez v. New York City Law Dep't*, 1997 WL 27047, at *6.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine the existence of any disputed issues of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Douglas v. Victor Capital Group*, 1998 WL 725216 at *9; *Ruiz v. Selsky*, 96 Civ.2003, 1997 WL 137448 at *3 (S.D.N.Y. March 24, 1997) (Peck, M.J.). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also, e.g., Douglas v. Victor Capital Group*, 1998 WL 725216 at *9. While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judg-

ment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see also e.g., Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12; *Douglas v. Victor Capital Group*, 1998 WL 725216 at *9; *Shaw v. City of New York*, 95 Civ. 9325, 1997 WL 187352 at *2 (S.D.N.Y. April 15, 1997) (Peck, M.J.); *Ruiz v. Selsky*, 1997 WL 137448 at *3.

## II. VANGUARD'S NEGLIGENT MIS-REPRESENTATION CLAIM FAILS BECAUSE THE PRICING BROKERS' DID NOT OWE A DUTY TO VANGUARD

In this diversity action alleging common law negligent misrepresentation claims, the parties have stipulated that New York law applies. (Rittinger Aff.Ex. AA: 2/27/98 Stip & Order ¶ 5: "it is therefore the law of New York that should be properly applied to the claims contained" in the Second Amended Complaint.) As the Second Circuit recently stated, "the parties agree that New York substantive law governs ... and 'where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.'" *Texaco A/S (Denmark) v. Commercial Ins. Co.*, 160 F.3d 124, 128 (2d Cir.1998) (quoting *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997)); *see also, e.g., Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995); *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 n. 5 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *Printers II, Inc. v. Professionals Publishing, Inc.*, 784 F.2d 141, 146 n. 6 (2d Cir.1986).

▪ Under New York law, in order to establish a cause of action against a professional for negligent misrepresentation, a plaintiff must show that there was "'actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F.Supp.

1071, 1093 (S.D.N.Y.1996) (Knapp, D.J. & Peck, M.J.) (quoting *Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 832, 605 N.E.2d 318 (1992)); *accord, e.g., AUSA Life Ins. Co. v. Ernst & Young,* 991 F.Supp. 234, 252 (S.D.N.Y. 1997). It is clear in this case that actual privity of contract did not exist between the parties. (*E.g.,* Rittinger Aff.Ex. CC: Jiorle 8/5/97 Aff. ¶ 14; Poto Aff. ¶ 12; Hoernner Aff. ¶ 12; Byram Aff. ¶ 12; Caffrey Aff. ¶ 12; Cashman Aff. ¶ 12; Epstein Aff. ¶ 12.) The focus of the inquiry, therefore, is whether Vanguard and the Pricing Brokers were in a relationship that sufficiently approached privity.

 The New York Court of Appeals has established a three-part test for determining whether a "near privity" relationship is present. The plaintiff must show: (1) awareness by the defendants that the statements were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance. *E.g., Dorking Genetics v. United States,* 76 F.3d 1261, 1269 (2d Cir.1996); *Bankers Trust Co. v. State Street Bank & Trust Co.,* 96 Civ. 7573, 1997 WL 177894 at *1 (S.D.N.Y. April 11, 1997); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. at 1092–93; *Cumis Ins. Society,*

*Inc. v. Citibank, N.A.,* 921 F.Supp. 1100, 1108 (S.D.N.Y.1996); *Prudential Ins. Co. v. Dewey, Ballantine,* 80 N.Y.2d at 384, 590 N.Y.S.2d at 834–35, 605 N.E.2d 318; *Ossining Union Free School Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 425, 541 N.Y.S.2d 335, 339, 539 N.E.2d 91 (1989); *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443 (1985). "While recognizing that 'these criteria permit some flexibility in the application of the doctrine of privity . . ., the [New York Court of Appeals has] made clear that [by establishing this three-part test] it did not intend to depart from its prior decisions requiring 'the practical equivalent of privity.' " *Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.,* 983 F.2d 1176, 1182 (2d Cir.1993) (quoting *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d at 554, 493 N.Y.S.2d at 445, 483 N.E.2d 110). The New York Court of Appeals has recognized that "we have defined this duty rather narrowly, more narrowly than other jurisdictions." *Ossining Union Free School Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d at 424, 541 N.Y.S.2d at 339.[3]

 Vanguard has failed to satisfy the second or third prongs of New York's three-part test.

The purpose of the second prong is "to protect a defendant from being subjected to liability for lawsuits brought over an 'indeterminate time' by the members of 'an

---

**3.** Defendants point to a separate line of authorities (Pricing Brokers Br. at 20) which hold that, in order to state a negligent misrepresentation claim under New York law, a plaintiff must show that the defendant is in a fiduciary or "special relationship" with the plaintiff. *See, e.g., Stewart v. Jackson & Nash,* 976 F.2d 86, 90 (2d Cir.1992) (fiduciary duty); *Champion Titanium Horseshoe, Inc. v. Wyman–Gordon Inv. Castings, Inc.,* 925 F.Supp. 188, 191 (S.D.N.Y.1996) ("fiduciary or other 'special' relationship"); *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 531 (S.D.N.Y.1996) (special relationship). However, this line of cases is inapplicable here as they concern situations where there has been a promise of future conduct. *See, e.g. Stewart*

*v. Jackson & Nash,* 976 F.2d at 87 (alleged promise by law firm to attorney that she would head environmental law department); *Champion Titanium Horseshoe, Inc. v. Wyman–Gordon Inv. Castings, Inc.,* 925 F.Supp. at 189 (contractual promise by defendants to manufacture horseshoes); *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. at 531 (contractual promise by defendant to "locate potential investors and bring them together with plaintiffs"). If this line of cases were applicable, it would provide an additional route to the same result, judgment for defendants, since Vanguard does not allege any fiduciary or special relationship between the Pricing Brokers and Vanguard.

indeterminate class.'" *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. at 1093 (citing *Vereins–Und Westbank, AG v. Carter,* 691 F.Supp. 704, 710 (S.D.N.Y.1988)); *see also, e.g., Ossining Free School Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d at 425, 541 N.Y.S.2d at 339, 539 N.E.2d 91; *Credit Alliance Corp. v. Andersen & Co.,* 65 N.Y.2d at 548, 493 N.Y.S.2d at 441, 483 N.E.2d 110 (known plaintiff component is to assure that defendant's potential liability remains within reasonable bounds in order to assure that it will not be potentially liable to "any member of an indeterminate class ... present and prospective, known and unknown"); *Ultramares Corp. v. Touche,* 255 N.Y. 170, 179–80, 174 N.E. 441, 444 (1931). "In fact, '[f]ederal courts have typically dismissed negligent misrepresentation claims brought by members of the general investing public.'" *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. at 1093 (quoting *In re Time Warner Inc. Sec. Litig.,* 794 F.Supp. 1252, 1264 (S.D.N.Y.1992), *aff'd in relevant part, rev'd on other grounds,* 9 F.3d 259, 271–72 (2d Cir.1993) (where privity of contract is absent, negligent misrepresentation cases do not apply to the investing public unless relying party has been identified to defendant), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *& In re Par Pharm., Inc. Sec. Litig.,* 733 F.Supp. 668, 686 (S.D.N.Y.1990)); *see also, e.g., First Equity Corp. v. Standard & Poor's Corp.,* 869 F.2d 175, 179 (2d Cir.1989) (investment financial information provider not liable for alleged negligent misrepresentation where information disseminated to "to an interested public of professionals"); *Daniel v. Dow Jones & Co.,* 137 Misc.2d 94, 96–97,

520 N.Y.S.2d 334, 336 (Civ.Ct.N.Y.Co.1987) (investment service not liable for alleged false statement distributed to over 20,000 subscribers); *Jaillet v. Cashman,* 115 Misc. 383, 384, 189 N.Y.S. 743, 744 (Sup. Ct.N.Y.Co.1920) (news ticker service not liable for alleged negligent statement where plaintiff was "but one of a public to whom all news is liable to be disseminated"), *aff'd,* 202 A.D. 805, 194 N.Y.S. 947 (1st Dep't 1922), *aff'd mem.,* 235 N.Y. 511, 139 N.E. 714 (1923).[4]

Here, the undisputed facts show that any member of the general investing public may trade in Futures Contracts. Vanguard has not shown that trading in this market is restricted to a determinable class of investors. The only evidence that Vanguard submitted is a conclusory statement that "[f]or the most part, [Futures Contracts] are regularly and routinely traded by sophisticated investors." (Jiorle 6/8/98 Aff. ¶ 6.) In a separate section of its brief, Vanguard argues that only a limited group of qualified investors trade in Futures Contracts, relying on the fact that the price of Futures Contracts are usually over $100,000, only "professional" investors invest in Futures Contracts because they are hedging instruments, and Vanguard owned 75% of the outstanding December Futures Contracts. (Vanguard 6/10/98 Br. at 37 n. 23.) The Court does not find that a reasonable inference to be drawn from these facts is that the number of people to whom the Pricing Brokers could potentially be liable is limited in any way. First, while the $100,000 price may exclude some members of the investing public, there is no indication that the num-

---

4. Vanguard's attempts to distinguish cases such as *First Equity, Dow Jones* and *Jaillet* are misplaced. Vanguard argues that the defendants in those cases are unlike the Pricing Brokers here as the former only published general financial news read by the public while the later are the "original source" of the pricing data. (Vanguard 6/10/98 Br. at 41.) Vanguard argues that "[i]t is the negligent performance of their pricing function that forms the basis of this action, not the

publishing of inaccurate information." (*Id.,* emphasis deleted.) The pertinent question however is the size of the class of people to whom the defendants would be liable based on their allegedly negligent acts. As discussed below, Vanguard's allegations as to the class of people to whom the Pricing Brokers would be liable is the same here as it was in those cases—namely, the general investing public.

ber of investors who can invest in Futures Contracts despite their high price is significantly limited. Second, the fact that Vanguard owned 75% of the outstanding December Futures Contracts does not allow the Court to infer that the number of people who trade in Futures Contracts is limited, because this percentage is based on one set of Futures Contracts and does not take into account all the past, current and future Futures Contracts. This unlimited group of contracts can be owned by an indeterminable number of investors. Thus, Vanguard has failed to show that it was anything more than one of an indeterminate number of past, present and future investors who can trade in Futures Contracts. As the New York Court of Appeals has held:

> We have declined to adopt a rule permitting recovery by any "foreseeable" plaintiff who relied on the negligently prepared report, and have rejected even a somewhat narrower rule that would permit recovery where the reticent party or class of parties was actually known or foreseen by the defendants. It is our belief that imposition of such broad liability is unwise as a matter of policy or, at the least, a matter for legislative rather than judicial reform.

*Ossining Union Free School Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d at 424–25, 541 N.Y.S.2d at 339, 539 N.E.2d 91 (citations omitted). Moreover, Vanguard has conceded that it "has not had any contact with any of the defendants whatsoever ... regarding the transactions that form the subject matter of this action." (Rittinger Aff.Ex. CC: Jiorle 8/6/97 Aff. ¶ 14; *see also* affidavits cited on pages 7–8 above.) Thus, here, as in *Time War-*

*ner,* it is clear Vanguard was "not specifically known to defendants until this suit was filed." *In re Time Warner Inc. Sec. Litig.,* 794 F.Supp. at 1264. As the *Time Warner* Court noted, the "non-privity cases that favor plaintiffs all involve dealings among a small number of parties known to the defendants, and whose reliance on defendant's representations was immediate and obvious." *In re Time Warner Inc. Sec. Litig.,* 794 F.Supp. at 1264.[5] Here, Vanguard has not alleged or shown that only a "small number of parties" purchase Futures Contracts, and it has conceded that Vanguard had no direct contact with defendants.

In support of its argument that it has met the second prong since it is a member of "a known and identifiable class," namely the "Municipal Bond Index Futures market participants" (Vanguard 6/10/98 Br. at 35, 36), Vanguard relies heavily on *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* in which I held that, under the second prong of the three-part test, "[k]nowledge of the identity of each particular plaintiff is not necessary, however, if the defendant's representation is designed to target a 'select group of qualified investors' rather than 'the public at large.'" *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. at 1093. The facts in *LaSalle,* however, are quite different. In *LaSalle,* plaintiffs alleged that Duff & Phelps, a securities ratings agency, assigned an erroneous "AA" rating to certain bonds in order to induce a limited class of investors to purchase the bonds. *Id.* at 1077. In denying defendant's motion to dismiss, this Court found that the second prong was adequately alleged by plaintiffs because

---

5. The cases cited by Vanguard (Vanguard 6/10/98 Br. at 36 n. 22 are distinguishable for similar reasons). *See MEI Int'l, Inc. v. Schenkers Int'l Forwarders, Inc.,* 807 F.Supp. 979, 985–86 (S.D.N.Y.1992) (direct contact between defendant and plaintiff which included direct consultation and furnishing of advice); *Duke v. Touche Ross & Co.,* 765 F.Supp. 69, 77 (S.D.N.Y.1991) (defendant accounting firm had solicited some of the plain-

tiffs to invest in limited partnership at issue and misrepresentations were printed in private placement memoranda "distributed to a select group of qualified investors"); *Kidd v. Havens,* 171 A.D.2d 336, 340–41, 577 N.Y.S.2d 989, 991–92 (4th Dep't 1991) (class of people to whom defendant title company could be liable was "fixed, definite and identifiable").

they claimed that Duff & Phelps (a) "knew that a select group of qualified investors would rely on the inaccurate rating contained in the [private placement] Offering Memoranda," (b) "was in direct contact with at least some of the plaintiffs, and with the broker dealers selling the Bonds," and (c) "knew that its misrepresentations were being circulated in a private placement memoranda to a select group of potential investors." *Id.* at 1093–94. In fact, in *LaSalle*, the bonds were " 'offered to a limited number of insurance companies, pension funds and similar institutional investors,' in denominations of $500,000 and increments thereof." *Id.* at 1094, n. 19.[6]

In this case, the undisputed facts show that Vanguard was not a member of a select group of qualified investors, but, by its own admission, a member of the general investing public. Furthermore, Vanguard admitted that it had absolutely no contact with the Pricing Brokers with regard to the December 19 BBI.[7] Moreover, the BBI was not distributed in a private placement memoranda, as in *LaSalle*, but published in *The Bond Buyer*. Thus, unlike the factual allegations in *LaSalle*, the undisputed facts here show that Vanguard was a member of the general investing public who chose to invest in Futures Contract and that Vanguard relied on public information computed pursuant to data submitted to *The Bond Buyer* by the Pricing Brokers, who had no direct contact with Vanguard. Moreover, in *LaSalle I* was willing to give plaintiffs the benefit of the doubt on this negligent misrepresentation claim because it would not add to the scope of discovery, since other claims rendered viable. *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F.Supp. at 1095. Here, in contrast, plaintiffs only claim is for negligent misrepresentation, and if it is dismissed, defendants will not be put to the expense of discovery—which is one of the purposes of the New York Court of Appeals' three-prong test. Therefore, Vanguard's reliance on *LaSalle* is misplaced for several reasons.

Furthermore, Vanguard also has not met the test's third prong. Vanguard argues that the terms of the Pricing Contracts create a "link" between it and the Pricing Brokers. (Vanguard 6/10/98 Br. at 37.) Vanguard points to two terms of the Pricing Contracts: (a) the paragraph in which the Pricing Brokers warrant that the price quotations are accurate and (b) the compensation clauses which include a bonus based on the average daily trading volume of Future Contracts. (Vanguard

6. The difference between $500,000 and increments thereof in *LaSalle*, and $100,000 here, is also of some significance. The Court, however, need not and does not express a view about what dollar amount is sufficient to create a select group of investors as distinguished from the general investing public. *Cf. Line–Item Veto; For Measure to Work, Pledges Are Necessary*, Dallas Morning News, April 12, 1996, at 30A (" 'You spend a billion here and a billion there. Sooner or later, it adds up to real money.' ") (quoting Sen. Everett Dirksen).

7. In its Rule 56.1 Counter–Statement, Vanguard does not admit or deny that it had no contacts with the Pricing Brokers, but, instead, states that it needs further discovery on this issue. (Vanguard Rule 56.1 Stmt. ¶ 21.) The Court finds this statement incredible as Vanguard has already admitted in one of its affidavits that it had no contact with any of the Pricing Brokers (Rittinger Aff.Ex. CC:

Jiorle 8/5/97 Aff. ¶ 14) and this information would clearly be obtainable through a review of its own records.

Vanguard also argues that "the issue of whether a relationship sufficiently approaches privity is a factual issue that must be resolved by the fact finder." (Vanguard 6/10/98 Br. at 41–42, emphasis deleted.) although the summary judgment motion is early in this case, the undisputed facts already submitted by the parties in this case compel the conclusion that, as a matter of law, Vanguard failed to meet the three-part test. Vanguard has set forth the key adjectives and phrases in its brief in order to meet the three-part test; however, it has simply not established a factual dispute that it was anything more than one investor in an innumerable class of investors who can put forth the $100,000 to purchase a Futures Contract, *i.e.*, the general investing public (or at least that large portion of the general investing public that can afford a $100,000 investment).

6/10/98 Br. at 11–13, 36.) However, this generalized "link" between the Pricing Brokers and *all* participants in the Futures Contracts market is insufficient to create a relationship between Vanguard and the Pricing Brokers that sufficiently approaches privity. The case law is clear that to satisfy the third prong of this three-part test, plaintiff must show, at the very least, some direct contact between plaintiff and defendant or some other direct conduct specifically linking the parties. *See, e.g., Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.,* 983 F.2d at 1183 (finding allegations were insufficient to show a relationship that sufficiently approached privity where plaintiffs' only allegation of direct contact was one meeting organized by defendants "directed to all prospective bidders" and not just the plaintiff); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. at 1094 (allegations demonstrated relationship approaching privity where there was direct contacts between defendants and plaintiffs, defendant shaped its work to meet the plaintiffs' needs and defendant was aware of select group of qualified investors to whom its information would be distributed in a private placement memorandum); *Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d at 385, 590 N.Y.S.2d at 835, 605 N.E.2d 318 (relationship sufficiently approached privity where defendant was aware that opinion letter it was directed to prepare by its client was to be used by plaintiff, defendant evidenced this knowledge by tailoring the language of its opinion letter to satisfy plaintiff's needs and defendant sent the opinion letter directly to plaintiff); *Security Pacific Bus. Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 704–06, 586 N.Y.S.2d 87, 92–93, 597 N.E.2d 1080 (1992) (plaintiffs failed to show a relationship sufficiently approaching privity where plaintiff only submitted evidence of one phone call made by defendant to plaintiff in which generalities were discussed and plaintiff failed to show that defendant (a) was retained to prepare the audit report for the purpose of inducing plaintiff to extend credit to defendant's client, (b) specifically agreed with its client to prepare the report for plaintiff's use, or (c) shaped the report according to plaintiff's needs or requirements); *Ossining Union Free School Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d at 425–26, 541 N.Y.S.2d at 339, 539 N.E.2d 91 (relationship sufficiently approached privity where defendants knew that the work it was to perform was for sole benefit of plaintiff and that their findings in ongoing project would be reported directly to plaintiff, defendants had various types of direct contact with plaintiff and the content of defendants' communications with their client evidenced their understanding of plaintiff's reliance); *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d at 553–54, 493 N.Y.S.2d at 444–45, 483 N.E.2d 110 (finding that relationship between plaintiff and defendant did not sufficiently approach privity where there was "no allegation that Andersen had any direct dealings with plaintiffs, had specifically agreed with [its client] to prepare the [accounting] report for plaintiffs' use or according to plaintiffs' requirements, or had specifically agreed with [its client] to provide plaintiffs with a copy or actually did so.) Indeed, there is simply no allegation of any word or action on the part of Anderson directed to plaintiffs. . . ." In contrast, as to other defendant, EAB, where "parties remained in direct communication, both orally and in writing, and, indeed, met together throughout the course of EAB's" business dealings with its client, Court found that the "parties" direct communications and personal meetings resulted in a nexus between them sufficiently Brokers (Rittinger Aff.Ex. CC: Jiorle 8/5/97 Aff. ¶ 14), Vanguard has failed to satisfy the third prong of the three-part test.

The Court notes that Vanguard admitted in a brief it submitted to the Northern District of Illinois that New York law "prohibit[s] recovery of person[s] who suffer economic losses in reliance on [negligent]

misrepresentations" by "those in the business of providing information for the guidance of others in commercial transactions." (Rittinger Aff.Ex. BB: Vanguard 8/13/97 Br. at 13.) The Court will not judicially estop Vanguard based on this admission, but it is telling—and certainly consistent with the decision independently reached by the Court.

### CONCLUSION

For the reasons set forth above, I recommend that the Court grant the Pricing Brokers' summary judgment motion.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL—CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied*, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.

1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a) & (e).

December 21, 1998.